May it please the court, James Siegel on behalf of Appellant Dominic Hardie, I'd like to reserve four minutes of my time for rebuttal. The District Court held that Title II does not provide for disparate impact viability and it granted the NCAA summary judgment on that ground. The NCAA does not now defend that conclusion. Its failure to do so is sufficient to resolve this appeal. Title II does in fact provide for disparate impact viability. The NCAA has now waived any argument to the contrary. This court may reverse and remand on that ground alone. This court should not reward the NCAA's failure to defend the District Court's legal conclusion, a conclusion the District Court adopted at the NCAA's urging, and entertain the NCAA's request to address its preferred fact-intensive arguments. Is there any issue in the case as to whether this policy did in fact create a disparate impact? The NCAA hasn't challenged our prima facie showing on appeal. We pointed to evidence below. Again, this is on summary judgment, so the question is whether there's... And the basis of that, if I understand it, is because more black people go to jail than white people? So that is true at a general population level, that the incidence of convictions among the black population is significantly higher than it is among the white population. And that's enough to create a disparate impact? Well, we actually, that could be in many circumstances depending on the skills and interests involved in applicants to the particular position. But here, in fact, we've showed, based on evidence with respect to this particular pool, so African Americans represented 80% of those denied approval due to a failing conviction, but were in fact only 46% of those granted approval. You haven't done the equivalent analysis though for the proposed policies you think they should do instead, right? That's What we have done is we've pointed to the fact that the disparate incidence in the general population has already been demonstrated to translate into this particular pool. So we already know that... But we don't know exactly how it translates or whether it's which sorts of felonies or who's out of prison and who's still in prison and available to coach under each of the different policies for different years. I mean, you haven't given the evidence to compare the policies specifically, have you? So again, this is a summary judgment, so all reasonable inferences need to be resolved in Mr. Hardy's favor. And I think especially given that we've demonstrated that the overall discrepancy translates into this... But is there any expert discovery that's still ongoing? I mean, if you have to go to trial on the evidence that we know now, because no discovery is continuing and we have what we have, how are you going to answer their footnote nine? I mean, if that's the right standard, how will you address it with the evidence you have? If it's not enough now, what's the inference you're going to change? So Dr. Beckett testified that non-violent felonies, there is a significant disparate impact in the general population between African-Americans and whites. And there's no reason to think that that particular discrepancy wouldn't also pertain in this particular population. So there's no blanket rule... So you're going to ask the jury to make a statistical inference about a new policy? It's not necessarily a statistical inference. I think it's just a reasonable inference from the facts before it. The contrary inference would require the jury to assume essentially that African-Americans are overrepresented in the violent felon category of people the NCA chooses to exclude, but then underrepresented in the particular category of non-violent felons. There's no reason to think that the population would have sorted itself out in that sort of odd and counter-intuitive way. There may not be if it's an absence of evidence, isn't it your burden as the plaintiff to prove it? I think it's just, it's a reasonable inference that could be drawn from the facts that we've presented. And again, so there's no general rule against the use of general population statistics. The Supreme Court, for example, has often relied on them in Dothard and Hazelwood. These are cases we've cited. This court has said that they must be viewed with caution in certain circumstances when you can't be certain that the incidents that exist in the general population will be expected to translate into the particular pool. So for example, I think we listed this in the brief as one example. If there's a particular degree or other certification that's required for a given position, so teachers, for example, might be required to have a particular certification. And so you have to look at the population of those who have. This sounds like an issue that's inherently fact-based and would have to be sorted out on a remand. But assuming that Title II applies, can you address the degree of control that the NCAA has alleged to have asserted over the tournament organizers that would render it liable? Certainly, Your Honor. And I would also add that that is also an incredibly fact-intensive issue which, for that reason, should likely be left for the District Court in the first instance of a remand. I'm not so sure. You're going to have to convince me on that. I'll try to do that, Your Honor. You have to. So the NCAA controls all aspects of this policy. It is the one that has prohibited Mr. Hardy from enjoying the privileges. My question is whether or not the tournament organizer is going to permit Mr. Hardy to coach a basketball team in the tournament. So what evidence do you have of NCAA control in making that determination? So we've pointed to evidence showing that the tournament organizers are essentially required to follow these NCAA policies. If they want NCAA recruiters and coaches to attend the tournament. That's correct. That doesn't prevent the tournament from going forward and basketball games being held. It would be a completely different tournament. And actually, Sam Lee, we pointed to his deposition testimony, he testified that if he couldn't get certification, this tournament would not occur. So the NCAA certification is incredibly important because it gives the tournaments essentially the purpose for being. The purpose of these tournaments is to allow these athletes to participate, secure scholarships, and expose themselves to NCAA coaches. So it's through that mechanism the NCAA is able to exercise control. So isn't it a legal question? You want us to decide whether that counts as control or counts as enough to make them a defendant? I'm not clear on what you think the fact dispute is that needs to be resolved by a jury. I think it's a complicated, factual issue whether the NCAA could be said to have caused a deprivation of rights. So Title II. And what evidence would you proffer to establish that fact of control? A number of things, Your Honor. First, we could point to the NCAA's general policy. The coaching approval policy isn't the sole policy that the NCAA has imposed on these tournaments. There's also requirements regarding insurance, the presence of medical professionals, the number of games that can be played. The NCAA really dictates all aspects of these tournaments. But is any of that contested? Is there anything where you say the NCAA invented this policy and they say, no, it was the venue and the jury has to listen to testimony and sort it out? Or is it everyone agrees on the facts and it's just the conclusion to be drawn from them? This is ultimately a question of proximate causation, I would say. And that is a factual, very fact-intensive inquiry that the jury will be asked to determine whether it can be fairly said that the NCAA is, in fact, the entity that has deprived Mr. Hardy of his right of access to these tournaments. And I think there are certainly ample facts from which the jury could draw that conclusion. Again, it's the NCAA that has imposed this policy. It's the NCAA that precludes Mr. Hardy from participating in these tournaments. And do you have a case that helps us think about that as a fact question rather than the one that should be decided by the court? I think the Katzenbeck, the Gulfstream case, which the NCAA is actually relying on for the idea that control is necessary here, that went to a bench trial. And the court there's three-judge panel and determined as a matter of fact that the particular individual in that case, he had the technical legal ability to control some of the theaters but not all of the theaters that were engaged in discriminatory conduct. And the court held as a matter of fact that... But he had an ownership interest in the venues, did he not? Not in all of them, no, Your Honor. And that's the key distinction. So he did have an ownership and actual legal control over some of those venues, but he didn't have it in many of the others. And in fact, the court emphasized that in some circumstances, other... He sat on some of the, on the other ones, he sat on the boards of the companies. But he didn't have a controlling legal interest. And the court actually emphasized that he had often been overruled and could be overruled by other parties. What it actually relied on and concluded as a matter of fact was that because of his position and because of the influence he had over others and sort of his general expertise in the area, he was able to effectively control the decision at all of the theaters and that the racially discriminatory policy of those theaters could be said to flow from him. That's directly analogous to the circumstances here. The NCA is the one that has imposed this policy that has a disparate racial impact. It is the one that can be held responsible for that policy. Savannah v., excuse me, Wesley v. Savannah is another case we've cited, which I think is also directly analogous. There it's a public golf course owned by the city of Savannah that allowed a tournament to be conducted, organized by the Savannah Golf Association. And the question there was whether the Savannah Golf Association itself could be said to violate Title II. And there is here you could just as easily say that the city of Savannah didn't need to allow this golf association to have its tournament. Here these owners of the particular venues in question need not necessarily allow the NCA to have its certified tournaments or have the particular tournaments in question be NCA certified. But the NCAA didn't own or lease any of the tournament venues, did they? That's correct, but it's not a requirement in Title II that there be an owner or lessor or anything like that. Title II just focuses on whether they deprive or... I thought Congress had eschewed aiding and abetting liability under the... This is not... We don't need to get into... We don't address whether Congress has authorized aiding and abetting liability because this is not aiding and abetting liability. The NCA, especially when the facts... I'm not so sure that that isn't your theory though, is it? They haven't helped another entity or said another entity to adopt a racially discriminatory policy. They have themselves adopted this policy. They're the ones that implement the coaching approval policy and determine which coaches will be allowed to participate in these NCA certified tournaments. But the policy essentially is binding on NCAA coaches and recruiters, and it says that unless the coaches at these tournaments are certified, NCAA coaches and recruiters may not attend them. They use the leverage that that creates to control the tournament organizers. So the tournament organizers, as a condition of certification, subject themselves to a whole host of NCA regulations. This is just one of them. So again, without the NCA regulations, the tournament organizers wouldn't necessarily have to insure their tournaments, they wouldn't have to provide medical personnel. There's extensive regulations that the NCA imposes through this mechanism of insuring that coaches can come, and that is the way that it imposes its control. The coaching approval policy is just one aspect of that. Do you dispute that footnote 9 of their brief asks the right question about how to evaluate disparate impact? I'm sorry, Your Honor, you'll have to... Footnote 9 is the one where they say they have the chart with fewer African-Americans are in this policy and that policy of who's denied, and they say you can't show the disparate impact just because fewer African-Americans would be denied access. I think it's very close to stating the correct standard, but it's slightly off in that the in a new policy wouldn't have to reduce what does have to reduce, or what we would have to show is that there's a disproportionate racial impact on those that would not be denied, but are currently denied. So comparing the two policies, comparing that population of individuals who would be allowed to participate... Under one policy. Under one... That aren't currently allowed to participate, but would be allowed to participate under our alternative policy, if that is a disproportionately African-American population, then allowing those individuals to participate may be a less discriminatory alternative because it will remove part of the disparate racial impact caused by the NCA's policy. I guess... Okay, so we have the current policy and a policy you want. Don't you have to show that under the policy you want, it's more similar in terms of the percentage of African-Americans and white people that are denied than the current policy is? No, and I'm sorry if I wasn't clear on that, but we have to show it as a less discriminatory alternative, and so we have to show that the alternative policy would have less of a disparate racial impact. There's a closer... You have to show that the percentage of African-Americans denied is closer to the percentage of whites under the policy you're asking for than the current one. We have to show that the change between policies has a disproportionate benefit to African-Americans, and so removing that added population... When you say disproportionate benefit, though, are you comparing to the white population or are you just counting African-Americans who are denied? We're comparing to the white population, so in this population of those approved, which is a good sample of all those who are applying, it's 46% African-American. Of those denied, it's 80% African-American. If the NCA implements a new policy that allows in all non-violent felons, for example, and that allows 200 additional African-American coaches, or excuse me, 200 additional coaches overall to participate, and 70% of those coaches are African-American, then it has a disproportionate benefit to African-Americans relative to their presence in the overall population and is therefore a less discriminatory alternative compared to the NCA's current policy. Okay. I think we get your point. You've got about a minute left. I'd like to reserve the balance of my time. Thank you very much. May it please the Court. With the Court's permission, I'll go directly to Judge Friedland's questions about what has to be shown and why we say there's no basis in the record from which a reasonable fact finder could find that. Mr. Waxman, would you introduce yourself for the record? Oh, I'm sorry. I'm Mr. Waxman representing the NCAA. Thank you. I'm sorry. I'm looking at a piece of paper telling me that, so I thought you had it too. That's why I'm here. So Judge Friedland, the question really, this case comes down to step three of the Ward's Cove analysis. That is, for purposes of the issue on appeal, we've conceded that our policy as it exists now has a racially disparate impact in that, as Dr. Bendix testified, the report shows African-American coaches were 1.7 times more likely to be denied than non-African-American coaches. And they have conceded, for purposes of the appeal, that our policy of not allowing our Division I coaches from attending tournaments in which convicted felons coach girls, high school girls, has a legitimate justification consistent with our policies and the way we conduct our recruiting processes. So the issue is step three of the Ward's Cove analysis. And Mr. Hardy's burden at step three is to show that the NCAA can equally achieve its legitimate objective in a manner that reduces the percentage, the degree of racial disparity such that a reasonable fact finder could conclude that maintenance of our insistence on maintaining our current policy is so arbitrary as to, quote, amount to a pretext for discrimination. That's the Ward's Cove standard. Now the record in this case, it is their burden on step three to show that. This was a case in which there was lavish and full factual discovery prior to the briefing and argument of this point on summary judgment. Not only was there full briefing and argument on this, there was full briefing and argument on three motions to strike certain aspects of the testimony that they purport to use to show their case. They adduced no evidence whatsoever from which a reasonable fact finder could conclude that Dr. Bendick studied the impact of the current policy only, not any alternative, as Mr. Hardy expressly told the district court in the summary judgment papers. Dr. Beckett's report doesn't even address the relevant population. She has general population statistics and the Supreme Court in the Beezer case and this number of cases have said that absent a showing that the relevant population, which in this case would be those convicted felons that not only were capable of coaching girls' basketball but wanted to coach girls' basketball and had been hired as a girls' basketball coach, reflected the general population and their own witness testified that that was not the case. Dr. Beckett's, even if you leave aside the impropriety or insufficiency of relying on general testimony, the evidence that her report indicates, and this is on page 273 of the excerpts of record, is plainly insufficient to show, to tell you anything about whether the degree of racial disparity would increase or decrease and that's for at least three reasons. Number one, the change in policy from 2007 to 2011 had to do with the fact that what the NCAA considers to be non-violent felons would be excluded only if their conviction was within the last seven years. Her report has nothing whatsoever to say about how recent a non-violent felon conviction would be. Number two, her report doesn't say anything about violent versus non-violent felony convictions. She expresses, she shows a graph, and again this is on page 273, she has statistics for property felonies, violent felonies, drug felonies, and weapons felonies. And what she says is that on a national basis, violent felonies, there's a 3.6% disparity. Property felonies, which are certainly non-violent felonies, there's a 2.7% disparity. Drug felonies, which could be either violent or non-violent, because if Mr. Hardy had been a prostitute high school teacher, he was arrested for selling crack cocaine across the street from the school, that would be considered a violent felony. But even leaving that aside, all we know from her report is that the degree of disparity involving violent felons is greater than the degree involving non-violent property felonies, but less than the degree involving drug felonies. And so therefore, she has nothing to say over whether or not going back to the 2007 policy, which is Hardy's alternative number one, would reduce the degree of racial disparity. Now neither Dr. Bendick nor Dr. Beckett have anything to say about what would happen to the degree of racial disparity if you adopted their alternative two, which is the sort of holistic review of all 25,000 people who apply to coach in these tournaments. They suggested in their brief in this case that another expert, Dr. Rosen, had said that. But that is false. Dr. Rosen told the court, and this is in its district court document 140 at page three, quote, this is what Hardy told the court, at no point does Dr. Rosen purport to be testifying as to the racial disproportionalities caused by any alternative policies. And so there simply is a failure of proof that under step three of the Ward's Cove analysis, either of the proposed alternatives would lower the degree of racial disparity. Now Judge Tallman, as to your question, which was our first alternative grounds for affirmance, the issue here is not whether or not we're responsible for our policy. The question is whether we were the ones that actually excluded Coach Hardy from the tournaments. And because Title II does not cover inducement or other forms of secondary liability, it reaches only those persons or entities who have authority by contract or property right to exclude or those who actually physically block access, as was the case in three of the cases they cited. In other words, primary liability only applies to those entities that actually exclude. Do the venues apply anything like this policy in tournaments that are not NCAA approved? Well, we actually don't know. We don't know anything in the record with respect to the tournament that was the issue of the dispute in this case, the Midsummer Night's Madness San Diego tournament. We do know that Coach Hardy coaches, sits as a coach in girls' non-scholastic basketball tournaments that choose not to be certified by the, that choose not to have themselves certified by the NCAA such that Division I coaches can go as spectators. And there was a suggestion by my friend that Sam Lee, who was the proprietor of the International Girls' Basketball Association, which was the sponsor of the Midsummer Night's Madness tournament, that he had to have this. Otherwise, he wouldn't put it on. But Sam Lee, in fact, testified, and this is at page nine of the second supplemental excerpts of record, that if he didn't get, if he doesn't get NCAA certification, he makes less money. And that is really what the nub of this case is. The tournament organizers and venues, there are plenty of them that put on tournaments that Division I coaches don't come to. The testimony was they make less money. And therefore, they are in no different position than, for example, if it had been the case that the NCAA didn't have this policy. But let's just say, you know, the Yukon women's basketball coach, the Stanford women's basketball coach, the Notre Dame women's basketball coach, the power coaches basically said, we don't want to have our staff attending tournaments where felons are coaching girls. And as a result, a lot of tournament organizers said, I'm not going to be able to get many teams unless I can get the, you know, the really notable women's basketball coaches there. The whole notion, I mean, that's, that may be different in degree between three coaches deciding or five coaches deciding and the NCAA, but it's not different in kind. And, I mean. If we agree with you about this, though, why wouldn't like the PGA tour then just hire an intermediary? I mean, you know, people have wedding planners. Why don't we have tournament planners? And then you blame the tournament planner for having this policy. Well, Judge Friedland, that's an interesting question. I hadn't thought of, you know, a wedding planner in that context. But I want to luxuriate in that thought. Even though maybe the wedding planner chose the colors, right? So here's the point. The point is, look, there's no monetary law. There are no damages liability under Title II. The point of Title II is to end policies that deny people the enjoyment of public accommodations. The PGA was responsible and was an appropriate defendant in the Casey Martin case because it was putting on the tournament. If this were a case where Coach Hardy was complaining about the fact. Any NCAA approved tournament has this policy because the NCAA wants it. And so if we agree with you, it seems like we're just asking the PGA. So yes, you're right. In Casey Martin, they were sponsoring the tournament. But next time, they'll just have a tournament planner. But no, no, no. The point is, whether the PGA had a tournament planner, if you're analogizing a tournament planner to the NCAA, the point is, if a tournament planner did this, the tournament planner wouldn't be liable as a principal. But the PGA, as the sponsor of the tournament, the PGA is the one who's actually saying, you can't participate, is liable. And so there were three other defendants in this case who were liable as principals, assuming that he establishes, in fact, a violation of Title II. Do you agree, Mr. Waxman, that Title II covers this?  Well, I think, Judge Faber, I've got two points to make. One, I also find it incredible to think that they can't, that the NCAA can't just say, listen, we're not going to have our Division I coaches associated in any way with a tournament that allows felons to coach girls or boys. We do concede, and I think we have to concede, that the tournaments themselves, as the tournament in Casey, was our public accommodations. That is, the tournament is a public accommodation. The question is whether we are the ones who are actually excluding coaches or whether we are simply saying, look, we don't want our Division I coaches to attend unless the following things occur. If you want to put on a tournament that doesn't follow these rules, that doesn't have health insurance, that makes the girls play five, you know, games a day, that allows felons to sit on the bench, that's fine. We don't control that. We're simply saying that we won't send our, we won't allow our coaches to attend. But why shouldn't we think of it as an NCAA-approved tournament? So once we concede that the tournament itself is the public accommodation, in order to have an NCAA-approved tournament, you have to follow these rules. And so at that point, isn't the NCAA making that the rule? The NCAA is making a rule about when each coaches would attend, just as would be the case, for example, if, I don't know, the National Organization for Women, or the National Women's Ladies, the National Women's Golfers Association said, okay, our women's professional golfers are no longer to play in PGA tournaments that allow men to participate who have a domestic violence conviction, okay? And as a result, the PGA says, fine, we're not going to sponsor tournaments anymore in which somebody with a convicted, who was convicted of a domestic violence offense can play. That doesn't make the Women's Professional Golfing Association responsible under Title II. They have provided the PGA as the sponsor of the tournament with a compelling financial reason to change its policies. But liability goes to the PGA, and the consequence will be this very same thing, really. If they hadn't settled with and dismissed the other defendants in this case, and their theory really held up, and this court held as a precedential matter both that disparate impact standard applies, and that it was satisfied in this case by these statistics, there either wouldn't be, D1 coaches wouldn't attend any more non-scholastic girls' tournaments, or that NCAA would change its rules to allow its coaches to attend something. And that's really the sum and substance of our position here. Thank you. Just in my limited amount of time, I'd like to emphasize the extent to which these are questions of fact, and they are disputed questions of fact. So, for example, my colleague on the other side is arguing extensively about the lack of control that the NCAA exercises here. That is the epitome of a question of fact. He mentions, for example, that the primary consequence of the tournament organizers is the loss of money. That may well be true, but the... But you would concede, would you not, that the NCAA is not the sponsor of these tournaments? That it is functionally, it serves a functionally equivalent role, at least if the facts are construed in the light most favorable of Mr. Hardy. That it is the relevant decision-maker here. It is the one... It doesn't hire the venue. It doesn't receive any portion of the proceeds. I mean, there are none of the indices of ownership or sponsorship over the actual tournament. So the question for purpose... It's different from a PGA-sponsored tournament. In the PGA case, that difference might have been relevant because the ADA is limited to owners and operators of the property in question, or lessors. Here the question is, and the language of Title II is, no person shall withhold, deny, or attempt to withhold, or deny, or deprive anyone of any right. The question is simply whether the NCAA has acted to do that. But it isn't the NCAA that's telling Mr. Hardy whether or not he can walk into the doors of the tournament. It's the NCAA that tells him whether he can coach in NCAA-certified tournaments, which are held in places of public accommodation. It's the sponsor of the tournament who decides that they're going to abide by the NCAA policy. It's not the NCAA that's telling him you can't walk in the door. But any time a third party owns the relevant venue, they could always preclude another organizer from coming in, whether they're a sponsor or not, and prevent them from doing whatever discriminatory policy they might choose to do. I think it's worth also emphasizing this point just purely as a legal matter. The question of who would be the proper defendant in this case would be the same regardless of the nature of the NCAA's policy. So for example, if the NCAA said, no African-Americans may coach in our certified tournaments, they would still claim, their argument would still hold that they can't be liable for that. That's certainly not the sort of result that Congress intended with Title II. Title II was also directed in part, for example, at members of the KKK. Your response to the question about whether or not it's perfectly permissible to simply say we don't want convicted felons coaching boys and girls basketball. We pointed to ample evidence that demonstrates that that is at least an overbroad policy, that there are numerous individuals, Mr. Hardy is one of them, who do have a felony conviction. But given the length of time since that conviction has occurred, their age, their employment history, their various other factors, they actually pose no more risk than someone who has never offended. In this society, we accept the fact that a felony conviction carries with it a number of consequences, including denying the right to vote, denying the right to possess or buy firearms, et cetera. Why is this not a perfectly legitimate reason? So it's actually been recognized in the Title VII context, for example, this kind of policy would be a cause of prohibited disparate impact. The EEOC has issued guidance and other courts have held as much, including the Eighth Circuit. You mentioned felony disenfranchisement laws. Those have been challenging. And sometimes, in fact, there's a Supreme Court case that found that, I believe it was Alabama, had opposed such a disenfranchisement laws with the purpose of discriminating against African Americans. That was held to be unconstitutional. Can I ask, I have one more question. So I'm going to have to watch the video to figure out what you were saying about the percentages and your disagreement with footnote nine, because I'm not sure I got it. But assuming I can figure out what your difference is with them, can you point me to something in any expert report that does the kind of comparison under your view of what the test should be? Because I read the experts' reports and I didn't see comparisons between, under any kind of interpretation of the policies you want versus the current. It was a two, it's a two-step process. We look at the Dr. Beckett's report mainly to infer what would be the rate of African Americans compared to whites in the particular policy that might be allowed to coach. And does Dr. Beckett's report break it down to 2008 or seven versus not, and before and after? I think she describes it as, these are discrepancies that exist, you know, throughout history, at least since the 50s or 60s. There's data taken from a number of different eras. I don't think there's any reason to think that the racial discrepancy between African Americans and whites has changed in any relevant way in the last seven years. And how do we decide if the drug crimes are violent or not violent? Excuse me, I'm sorry. So the statistics, the drug, I think it was the drug category, controlled substances category, has a higher rate of African Americans. How do we know if that counts as violent or not under the alternative policy? So Dr. Beckett characterized those as nonviolent. We would also characterize those as nonviolent. The NCA might want to carve out some subset of those that it would classify as violent. And that's something that we wouldn't necessarily have a view on that at this point. That's something that could be hashed out in a remedial order. We would still have established that there is an alternative that is less discriminatory. It's the subject of some litigation in the circuit. Excuse me? It has been the subject of some litigation in the circuit. It constitutes a crime of violence. Certainly, certainly. That is true. And yeah. All right. On that note, we are adjourned. The case is submitted for decision. We'll get an answer as soon as we can. Thank you all for a very interesting argument.
judges: Tallman, Friedland, Faber